IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JULIANN P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:23CV113 |
| | ) |
| MARTIN J. O'MALLEY,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Juliann P. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The Parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on February 12, 2020, alleging a disability onset date of February 12, 2019. (Tr. at 12, 185-88.)[2] Her application was denied

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #2].

initially (Tr. at 68-81, 91-100) and upon reconsideration (Tr. at 82-88, 101-10). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 111-12.) On May 19, 2022, Plaintiff, along with her attorney, attended the subsequent telephone hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 12.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 30), and, on December 5, 2022, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a

verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 *et seq.*, provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 15.) At step two, the ALJ further determined that Plaintiff suffered from two severe impairments:

> migraines, and other headache syndrome[.]

(Tr. at 15.) The ALJ found at step three that neither of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 18.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform the full range of work at all exertional levels, but with further, non-exertional limitations. Specifically, the ALJ found as follows:

> [Plaintiff] must avoid concentrated, meaning more than occasional, exposure to unprotected heights, bright outside sunlight, and to noise levels of "3" or higher as defined in the [Dictionary of Occupational Titles ("DOT")], which provides illustrative examples of a department store, grocery store, or light traffic.

5

(Tr. at 19.) At step four of the analysis, the ALJ determined, based on the testimony of the vocational expert, that Plaintiff remained capable of performing her past relevant work as a lifeguard and pool manager. (Tr. at 28.) The ALJ also made an alternative finding at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 28-30.) Plaintiff now contends that in formulating the RFC assessment, the ALJ failed to properly evaluate the medical opinions of Drs. Jaskiran Vidwan, Matthew Harris, and Jaquelyn Harrison.

With respect to the evaluation of opinion evidence, under the applicable regulations for claims filed on or after March 27, 2017,

> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .
>
> (1) <u>Supportability.</u> The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) <u>Consistency.</u> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
>
> (3) <u>Relationship with the claimant</u> . . . [which includes]: (i) Length of the treatment relationship. . . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . . [and] (v) Examining relationship. . . .

6

> (4) <u>Specialization</u>. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.
>
> (5) <u>Other factors</u>. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c) (emphases added).[5] The regulations also require decision-makers to "articulate in [their] decision[s] how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. § 404.1520c(a), (c)(1)-(c)(2). Therefore, paragraph (b) further provides that ALJs "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination of decision." 20 C.F.R. § 404.1520c(b)(2). Express discussion of the remaining factors is not required. <u>See</u> 20 C.F.R. § 404.1520c(b)(2); <u>see also</u> <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u>, 82 Fed. Reg. 5844, 5853, 2017 WL 168819 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs] to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a

---

[5] In her Reply Brief, Plaintiff cites to the recent Fourth Circuit decision in <u>Shelley C. v. Commissioner of Social Security Administration</u>, 61 F.4th 341, 353 (4th Cir. 2023). However, that case involved application of the "treating physician rule" under the prior regulatory provisions for claims filed prior to March 27, 2017.

minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness). In other words, § 404.1520c(b)-(c) defines the "minimum level of articulation" an ALJ must include in her written decision "to provide sufficient rationale for a reviewing . . . court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5858; see also Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018).

Accordingly, the question in the present case is whether the ALJ adequately addressed whether each of the medical source opinions at issue was supported by the source's own records and consistent with the other evidence in the record. See 20 C.F.R. § 404.1520c(b)(2), (c)(1)-(2). Notably, "the relevant regulations do not require particular language or adherence to any particular format in a decision, so long as the ALJ reasonably articulates her decision so that a reviewing court can trace the path of the adjudicator's reasoning." Boyd v. Kijakazi, No. 2:21cv29, 2022 WL 949904, at *2 (E.D. Va. Mar. 29, 2022) (internal quotations omitted). Nevertheless, "whatever format the ALJ *does* choose must allow a reviewing court to discern an 'accurate and logical bridge' from the record evidence to the ALJ's conclusion." Id. at *3 (quoting Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018)). In particular, the ALJ must connect her discussion of the record evidence with her findings as to whether a specific source's opinions were consistent with and supported by that evidence. If this connection is not set out in a manner which allows the Court to "'trace the path' of the ALJ's reasoning," Boyd, 2022 WL 949904, at *3, the Court may not "fill in the blanks" in the ALJ's analysis, Allison E. B. v. Kijakazi, No. 2:21-cv-29, 2022 WL 955013, at *8 (E.D. Va. Jan. 31, 2022).

In the present case, the ALJ expressly considered all three of the opinions at issue and found them "partially persuasive." (Tr. at 26-27.) However, Plaintiff argues that the

8

Case 1:23-cv-00113-JEP    Document 14    Filed 03/29/24    Page 8 of 18

explanations underlying the ALJ's findings were insufficient under 20 C.F.R. § 404.1520c. In particular, Plaintiff contends that the ALJ failed to specifically address the consistency and supportability of each provider's opinion, as required by 20 C.F.R. § 404.1520c(b)(2), which dictates that the ALJ "will explain" how the consistency and supportability factors were considered in the decision. However, the ALJ's decision in this case reflects a thorough and extensive analysis and explanation, as set out below.

First, Plaintiff challenges the ALJ's analysis of the decision of the state agency psychologist on initial review, Dr. Jacquelyn Harrison. Notably, Dr. Harrison concluded that Plaintiff is moderately limited in her ability to remember detailed instructions, but is able to understand and remember short, simple instructions. (Tr. at 76.) Dr. Harrison similarly concluded that Plaintiff was moderately limited in her ability to carry out detailed instructions, but not limited in her ability to carry out very short and simple instructions. (Tr. at 76.) Finally, Dr. Harrison found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, but would be able to sustain concentration and persistence in a low production environment, and was able to adapt to changes in a low stress environment. (Tr. at 77-78.) Thus, Dr. Harrison concluded that Plaintiff is capable of full-time work, although Plaintiff contends that the ALJ should have incorporated limitations to short, simple instructions, a low-production environment, and a low stress environment. (Pl. Br. at 20.)

> In analyzing Dr. Harrison's opinion, the ALJ found that:
>
> the moderate limitations found in the "B" criteria are inconsistent with the mental status examination findings and neuropsychological testing and claimant's subjective allegations in a function report and reported activities of daily living.

9

(Tr. at 26.) Thus, the ALJ gave four reasons for concluding that Dr. Harrison's evaluation was not consistent with or supported by the evidence in the record: (1) it was inconsistent with the mental status examination findings; (2) it was inconsistent with neuropsychological testing; (3) it was inconsistent with Plaintiff's subjective allegations in the function report; and (4) it was inconsistent with Plaintiff's activities of daily living. The ALJ's decision addresses each of these categories of evidence at length. With respect to the mental examination findings, the ALJ found that Plaintiff had "consistently normal objective mental status exam findings that have been made at office visits" with Apex Psychiatry. (Tr. at 15.) The ALJ noted that "mental status examinations and other treatment notes, document memory within normal limits generally" and "mood and affect within normal limits." (Tr. at 16, 17.) Specifically with respect to concentrating, persisting or maintaining pace, the ALJ found that Plaintiff's "treatment notes do not document any significant deficits in this area on mental status examination." (Tr. at 17.) The ALJ also included an extended summary and analysis of the treatment records, noting the normal mental status examinations. (Tr. at 21, 22, 23, 24, 25.) With respect to the neuropsychological testing, the ALJ explained that:

> Neuropsychological evaluation in August 2018 for evaluation of cognitive functioning documented report of remote 2008 evaluation with findings consistent with ADHD, inattentive type. The claimant endorsed continuing to take Adderall for ADHD since that initial evaluation but endorsed new cognitive impairment/memory impairment since her sinus illness. The claimant additionally endorsed anxiety rated 1/10. On examination, the claimant denied taking her Adderall that day. Behavioral observations were within normal limits. Test results measured full-scale IQ 105 on WAIS-IV testing consistent with her prior testing. Auditory/working memory subtest was average for her age and similar to and improved from prior 2008 testing. Processing speed was also average. Verbal memory was strong with immediate recall average and superior spontaneous recall. Mild weakness was noted in attention, consistent with

> ADHD, but overall cognitive functioning was intact with strength in well above average visuospatial abilities and memory (Exhibit 2F/81-84).

(Tr. at 22.) The ALJ also noted that she "exhibited cognitive difficulties" in an earlier May 2018 neuropsychological evaluation but "she showed improvement and recently completed a certification through UNC Chapel Hill in data science." (Tr. at 16.) With respect to Plaintiff's subjective allegations in the function report, the ALJ noted that in her function report, Plaintiff

> endorsed pet sitting occasionally for friends and/or neighbors and denied problems performing personal care tasks. [She] endorsed preparing simple meals and performing laundry and occasional yard work. [She] endorsed seldomly going outside secondary to experiencing headaches in bright lights/sunlight and seldomly shopping in stores due to lights/noise. [She] endorsed regular social engagement. Overall, [she] reported deficits in squatting, bending, memory, concentration, and understanding. Specifically, [she] reported slower word recall, slower responses, and slower processing speed. She additionally noted slight deficits in following spoken instructions as compared to written instructions and some difficulty in novel, stressful situations (Exhibit 3E).

(Tr. at 19-20.) With respect to Plaintiff's activities, the ALJ noted that

> she teaches swim lessons at the Chapel-Hill (NC) YMCA and occasionally teaches lifeguard classes. She teaches lessons 2 hours a day about 3-5 days a week. On Saturdays she teaches lessons for 4 hours. The claimant said all of her swim lessons are conducted at indoor pools. The number of people she teaches at one time varies depending on the age group, from preschoolers age 3-5, children up to age 13, and adult. The claimant indicated on average she has 5-6 people in a swim class. The claimant testified there is generally a swim team practice going in the pool as well as another swim lesson while she is teaching her swim class. She has coached swim teams at the YMCA in the past, but not since the summer of 2018. She generally drives herself to work. Her parents might pick her up if she has a headache at work, but the claimant explained "that is not a hug[e] occurrence, once every six months or so."

(Tr. at 15.) The ALJ cited Plaintiff's "ability to teach swim classes to groups of people several times a week for 2-4 hours at a time" as "a strong indication that the claimant's mental impairments are not severe." (Tr. at 16.) The ALJ also noted that specifically

as to concentration, persistence or maintaining pace, she "reported activities of daily living, including reading and completing schoolwork, that would inherently require the ability to maintain attention and concentration." (Tr. at 17.) With regard to the coursework, the ALJ further explained that

> [a]t the hearing, the claimant testified that she has an Associate's Degree in Science. She alleged having eyestrain if she reads too much on the computer. However, she also testified that she took and completed an online course in data science last year in March 2021 thru UNC-Chapel Hill in hopes of doing that kind of work. The claimant reports she had an "eye reduction thing" on the computer screen when taking the data science class.

(Tr. at 20.)

Thus, the ALJ gave four reasons for discounting Dr. Harrison's opinion based on consistency, that is, that it was "inconsistent with the mental status examination findings and neuropsychological testing and claimant's subjective allegations in a function report and reported activities of daily living." (Tr. at 26.) Each of those specific areas is addressed at length in the ALJ's opinion, as noted above. Therefore, the Court cannot conclude that the ALJ's assessment of Dr. Harrison's opinion warrants remand.[6]

Plaintiff also contends that the ALJ failed to adequately explain the assessment of the neuropsychological evaluation of Dr. Matthew Harris. Dr. Harris undertook the evaluation in August 2018, and it reflects average IQ, average attention and processing speed, average processing speed with visual scanning, average word reading speed, intact language that was

---

[6] The Court also notes that to the extent Plaintiff contends that the ALJ should have incorporated limitations to short, simple instructions, a low-production environment, and a low stress environment (Pl. Br. at 20), the Vocational Expert specifically testified that a limitation to only understanding, remembering and carrying out simple instructions would not change the availability of the alternative positions identified at step two (Tr. at 62-63), and there is no indication that the representative positions are production-paced positions. However, the Court need not consider that further given the sufficient explanation provided by the ALJ, as discussed above.

12

Case 1:23-cv-00113-JEP   Document 14   Filed 03/29/24   Page 12 of 18

fluent and without error or difficulty, strong visuospatial ability, strong verbal memory, and strong visual memory. (Tr. at 389-90.) Dr. Harris concluded that Plaintiff's cognitive abilities were mostly intact, although she did show mild weakness in attention attributable to her ADHD, similar to prior testing in 2008. Dr. Harris noted that her results were actually improved compared to testing in 2008, and her cognition was strong and had recovered to baseline when she is not overtly tired or stressed. With respect to his Recommendation, Dr. Harris explained that he:

> [did] not have concerns for [Plaintiff's] cognitive capability to manage instrumental activities of daily living or work when she is not overly tired, stressed, or in pain. However, given her known illness, she may have some sensitivity to these things. It is important that her work continue to allow her breaks if she has been working for a long time, especially in the bright sun.

(Tr. at 390.) In evaluating this opinion, the ALJ found that

> The opinion of Dr. Harris is partially persuasive (Exhibit 2F/84). Following an August 2018 neuropsychological evaluation, Dr. Harris found no concerns for the claimant's cognitive capability to manage instrumental activities of daily living or work when she is not overly tired, stressed, or in pain. However, due to sensitivity to those things, he opined it important that her work continue to allow her breaks if she has been working for a long time, especially in the bright sun. Dr. Harris' opinion is vague to the extent he opines sensitivity to managing activities of daily living or work. With regard to allowance of breaks, the opinion is vague with respect to what amount of time constitutes a "long time", though to the extent the opinion implies avoidance of bright sun the undersigned finds this consistent with the claimant's report of migraine aggravation in sunlight and supported by the medical evidence as a whole.

(Tr. at 26.) Thus, the ALJ relied on Dr. Harris' opinion, and included a restriction to no more than occasional exposure to bright sunlight. The ALJ found that Dr. Harris' recommendation that Plaintiff would need "breaks if she has been working for a long time, especially in the bright sun" is vague with respect to what he meant by a "long time," but the basis for the recommendation appeared to relate to concerns regarding exposure to bright sunlight, and

13

that was included in the RFC. The ALJ thus considered and addressed the opinion evidence and incorporated it in the RFC, and it is not clear what other functional limitations would be required by Dr. Harris' opinion. Therefore, the Court cannot conclude that the ALJ's evaluation of Dr. Harris' opinion requires remand.

Finally, Plaintiff contends that the ALJ erred in the evaluation of her treating physician Dr. Jaskiran Vidwan. Dr. Vidwan provided an opinion letter, which the ALJ evaluated as follows:

> The opinions of Dr. Vidwan are partially persuasive (Exhibits 7F/4, 10F, 11F). In April 2022, Dr. Vidwan completed an assessment on the claimant's behalf regarding her migraines/headaches. Therein, he noted the claimant experienced 6 headaches per month lasting 6 hours or more triggered by bright lights, noise, exercise, and lack of sleep. No positive test results or objective signs of headache were noted. Dr. Vidwan noted the claimant premedicating prior to exercise and treating acute pain as needed. He opined preclusion generally from performing even basic work activities and need for a break from the workplace during headaches, need for unscheduled breaks, and need to be absent more than 4 times a month without explanation. Dr. Vidwan's opinion is inconsistent with his earlier treatment notes indicating minimal headaches as July 2020 with medication management and pain disability index scores indicating mild disruption with daily life. Dr. Vidwan's contemporaneous treatment notes indicating significant improvement in headaches with injections and while his opinion reflects the claimant's most recent subjective allegations of headache frequency and duration, it is inconsistent with the examination findings and report that those headaches do not require any significant treatment. With regard to Dr. Vidwan's statement in Exhibit 7F on page 4, he indicates the claimant was advised to wear migraine prevention glasses in situations that tend to trigger migraines, such as using the computer and while lifeguarding. This opinion is qualified to advise use so long as it does not interfere with the ability to perform duties as a lifeguard and accounted for in the residual functional capacity by avoidance of concentrated exposure to bright outside sunlight.

(Tr. at 27.) Thus, it appears that the ALJ found Dr. Vidwan's opinions only partially persuasive due to the inconsistency of these limitations with his treatment notes, which chronicled (1) relatively minimal headaches in July 2020, (2) indication that the headaches could be addressed

14

with medication, (3) pain disability index scores indicating mild disruption with daily life, (4) significant improvement in headaches with injections, and (5) examination findings. The ALJ also noted that Dr. Vidwan separately indicated that Plaintiff was advised to wear migraine prevention glasses in situations that could trigger migraines such as using the computer and lifeguarding, as long as it did not interfere with lifeguarding duties, and that restriction was accounted for in the RFC by the restriction on exposure to bright sunlight. (Tr. at 27.) The ALJ's evaluation of the inconsistency with Dr. Vidwan's treatment notes is further reflected in the extensive discussion of the treatment notes. Those notes reflect that Plaintiff saw Dr. Vidwan in March 2020 and "reported headaches with less intensity and shorter duration, often resolving without treatment within an hour." (Tr. at 24, 579.) These reports reflect that an increase in medication had helped with her headaches. (Tr. at 579.) Plaintiff reported that her migraines were "exercise induced" with a pain disability index score representing pain causing only "a mild disruption" to Plaintiff's life, and with her visual strain mostly resolved. (Tr. at 24, 579.) She was provided with various medication options, and a future option of nerve blocks or Botox injections. (Tr. at 580.) Treatment notes in July 2020 reflect that she "continued to note improvement with headaches" and reflect that she went an entire month with no headaches while not working. (Tr. at 24, 590.) When she returned to working, she reported a migraine with her first lifeguard shift, but premedicated for her second lifeguard shift without development of a migraine. (Tr. at 24, 590.) Her pain disability score remained in the "mild disruption range." (Tr. at 24, 590.) It was at this visit that she was encouraged to wear migraine prevention glasses when using the computer at work so long as they would not interfere with her duties as a lifeguard. (Tr. at 24, 592.)

15

The ALJ then noted a "gap in treatment" with Dr. Vidwan (Tr. at 25), and Plaintiff saw him 14 months later in September 2021. At that visit, she "endorsed frequent low-grade headaches that are distractible but do not require any treatment." (Tr. at 25, 730.) She reported using medication to treat any acute pain. (Tr. at 730.) Dr. Vidwan's treatment record also notes that prior treatment records from July 2021 reflect that she "reported little to no headaches" and "headaches were well controlled" with medication. (Tr. at 731.) At the appointment in September 2021, Dr. Vidwan set out a recommended medication protocol, as well as future options for additional injections if necessary. (Tr. at 732.) Finally, she saw Dr. Vidwan again in March 2022, when she reported 6 headaches that month but noted that they were "less intense but are lasting longer." (Tr. at 656.) She continued with medication for acute pain. (Tr. at 656.) Dr. Vidwan noted that her headaches were under better control on a prior medication but "[s]he does not want any other medications at this time." (Tr. at 657.) As noted by the ALJ, "Dr. Vidwan discussed with the claimant that her headaches were under better control when she was on Trokendi when she endorsed little to no headaches, though she did not want to add any other medications. The claimant noted she had difficulty remembering to take the medication she was already on." (Tr. at 25.) Dr. Vidwan provided her a medication plan, with premedication prior to exercise, and with future options for additional medications and injections if needed. (Tr. at 657.)

These treatment records support the ALJ's assessment of (1) relatively minimal headaches in July 2020, (2) indication that the headaches could be addressed with medication, (3) pain disability index scores indicating only mild disruption with daily life, (4) significant improvement in headaches with injections, and (5) examination findings, which were the

16

reasons given by the ALJ for discounting the more extreme opinions of Dr. Vidwan and for concluding that Dr. Vidwan's opinion was inconsistent with his treatment records. It is the role of the ALJ, not the Court, to make that assessment, and there is substantial evidence to support the ALJ's conclusion. Again, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, Plaintiff specifically challenges the ALJ's assessment of the opinion evidence, but the ALJ reviewed the evidence, explained her decision, and clearly explained the reasons for her determination. That determination is supported by substantial evidence in the record. Plaintiff has not identified any errors that require remand, and Plaintiff's Motion to Reverse the Decision of the Commissioner should therefore be denied.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dipositive Brief [Doc. #8] is DENIED, that

17

Case 1:23-cv-00113-JEP   Document 14   Filed 03/29/24   Page 17 of 18

Defendant's Dispositive Brief [Doc. #12] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 29th day of March, 2024.

/s/ Joi Elizabeth Peake  
United States Magistrate Judge